PRODUCING PROPERTIES, INC.,
Appellant,

v.

SOHIO PETROLEUM COMPANY, Appellee.

No. 17089.

Court of Civil Appeals of Texas.

Dallas.

May 3, 1968.

Lionel E. Gilly, Jerry P. Jones, of Thompson, Knight, Simmons & Bullion, Dallas, Tex., for appellant.

Stuart G. Johnston, Jr., Oklahoma City, Okl., for appellee.

DIXON, Chief Justice.

This is an appeal from a summary judgment.

Appellant Producing Properties, Inc., hereinafter called PPI, on July 31, 1963 agreed to sell and thereafter did sell and convey to appellee Sohio Petroleum Company, hereinafter called Sohio, certain oil and gas properties, the effective date of the sale and transfer being September 1, 1963. The contract between the parties contained this provision:

"PPI shall bear all costs, expenses and liabilities in connection with the PPI properties incurred prior to the Effective Date and shall indemnify and hold

harmless Sohio and Morse[1] from all liability on account thereof * * *."

At the time of the conveyance the properties involved were subject to a "Unit Agreement, Staley-Mangold Unit, Wichita and Archer Counties, Texas," and a "Unit Operating Agreement." These agreements between various working interest owners, including PPI, though executed earlier, actually went into operational effect on January 1, 1962.

The Operating Agreement provides for the appointment of a Unit Operator and gives him certain powers. Other rights and powers are retained by the working interest owners.

In March 1967 the Unit Operator by Debit Memorandum billed Sohio for the sum of $8,438.29, with the explanation: "To charge you for *intangible adjustment* on the Staley-Mangold Unit *at the time of Unitization*." (Emphasis ours.)

Sohio made demand on PPI for payment of the amount named in the memorandum, claiming that the liability of PPI for payment of the unit intangible investment was incurred January 1, 1962 when the Unit Operating Agreement went into effect. This, of course, was long prior to the effective date of the sale and transfer of the properties on September 1, 1963 by PPI to Sohio. PPI denied liability and refused to pay the Unit Operator.

On August 22, 1967 Sohio paid the alleged indebtedness of $8,438.29 to the Unit Operator. It is Sohio's position that if it had not paid the debt interest would have accrued thereon and the working interest conveyed by PPI to Sohio would have been subject to foreclosure by the Unit Operator, all as provided by the Operating Agreement. In this suit Sohio seeks recovery from PPI for the $8,438.29 under the terms of the indemnity provision of the contract of sale as quoted in the first paragraph of this opinion.

The answer of PPI includes a general denial and (1) a plea that the obligation, if it did exist, was barred by the four year statute of limitations at the time the Unit Operator made demand in March 1967 and at the time Sohio paid the $8,438.29 on August 22, 1967, and (2) that no liability was incurred prior to September 1963, the date when the properties were sold and conveyed to Sohio.

Both parties filed motions for summary judgment. The motion of PPI was overruled. That of Sohio was sustained. Judgment was accordingly rendered in favor of Sohio for $8,438.29, plus interest and court costs.

■ We shall first consider the second crosspoint of PPI in which it is asserted that it was error for the court to refuse to sustain PPI's motion for summary judgment because the record shows that if PPI was liable for the intangible investment adjustment on or before September 1, 1963, the effective date of the sale of the properties by PPI to Sohio, as Sohio claims, such obligation was barred by the four year statute of limitation insofar as PPI is concerned when paid by Sohio; therefore PPI is entitled to judgment as a matter of law. We agree with PPI.

It is undisputed that Sohio's whole cause of action is based on its contention that liability for the intangible investment adjustment was incurred January 1, 1962 and was therefore PPI's obligation. Indeed, Sohio nowhere claims that the indebtedness could have been incurred on any other date than January 1, 1962. In its Second Amended Original Petition on which Sohio went to trial Sohio pleads as follows: "The obligation of Defendant to pay for its share of the Unit intangible investment adjustment * * * was incurred and was fixed and existed as of January 1, 1962 * * *."

In Sohio's motion for summary judgment there is this recitation, "Plain-

---

1. Morse is not involved in this lawsuit.

tiff seeks to recover upon its claim as pleaded in its Second Amended Original Petition."

In its brief Sohio says, "Appellant became bound to pay its share of the *intangible* investment adjustment \* \* \* when the Unit Operating Agreement, to which it was a party became effective \* \* \*." (Emphasis ours.) In other places in Sohio's brief the substance of the above statement is repeated. It is admitted by both parties that the effective date of the Unit Operating Agreement is January 1, 1962.

The debit memorandum sent to Sohio by the Unit Operator in March 1967 expressly states that the charge of $8,438.29 is for intangible adjustment "*at the time of unitization.*" (Emphasis ours.)

It is undisputed that Sohio paid the alleged debt on August 22, 1967, more than five and a half years after the liability was incurred by PPI, according to Sohio, on January 1, 1962.

Sohio says that limitation does not start to run against an indemnitee until breach of the indemnity agreement by the indemnitor. According to Sohio PPI did not refuse to pay the debt until some time in 1967, therefore limitation had not run against Sohio's cause of action when this suit was filed in 1967.

We do not disagree with Sohio's abstract statement of the law of limitations, but the rule is not applicable here.

■ We think the rule applicable here is that when an indemnitee pays a third party's money claim against an indemnitor to which claim the indemnitor has a good defense, the indemnitee is not entitled to recover against the indemnitor. Price v. Steves, 175 S.W.2d 450 (Tex.Civ.App., San Antonio 1943, writ ref'd w. o. m.). See also 42 C.J.S. Indemnity § 12, p. 580 and cases there cited. Had the Unit Operator sued PPI in March 1967 or later on an obligation incurred January 1, 1962 PPI's defense of limitations would have been good.

Had the operator sued Sohio on the alleged obligation Sohio also could have interposed the defense of limitations. To hold otherwise would mean that an indemnitee by the payment of an indemnitor's debt which is barred by limitations can deprive an indemnitor of its legal defense against the alleged indebtedness. Under such circumstances the payment by the indemnitee will be a voluntary payment for which it is not entitled to a judgment against the indemnitor under its indemnity contract. We sustain PPI's second crosspoint.

If we be in error in concluding that the alleged obligation, if it existed, was barred by limitation when paid by Sohio, we nevertheless are of the opinion that this judgment must be reversed on the grounds raised in PPI's one point of error and second crosspoint.

■ In a point of error PPI alleges that it was error to enter a summary judgment against PPI because (1) Sohio failed to submit any evidence as to material issues of fact necessary to its cause of action against PPI; and (2) alternatively, Sohio failed to establish conclusively the material facts necessary and essential to its cause of action.

In its first crosspoint PPI alleges that the record before the court conclusively establishes that PPI had incurred no liability for the Unit intangible investment adjustment before the effective date of the sale, September 1, 1963, therefore PPI is entitled to judgment as a matter of law.

In its statement and arguments under the above point and crosspoint we gather that PPI bases its contention on the grounds (1) that the tangible and intangible investment adjustments must be considered together before it can be determined whether a working interest owner is to be credited or debited—which has never been done; and (2) the final investment adjustment, including both the tangible and the intangible adjustments, must be approved by 80 per cent of the voting inter-

est of the working interest owners—which has not been done; and (3) the number of wells to be included in the computation of the investment adjustment must be approved by 80 per cent of the voting interest—which has not been done.

In order to find the correct answers to PPI's point on appeal and its first cross-point it is necessary to analyze several provisions in the Unit Operating Agreement. Among these provisions are those under the heading "ARTICLE 11—ADJUSTMENT OF INVESTMENTS." We quote the material parts of "ARTICLE 11":

## "ARTICLE 11
## ADJUSTMENT OF INVESTMENTS

11.1 PERSONAL PROPERTY TAKEN OVER. Upon the effective date hereof, Working Interest Owners shall deliver to Unit Operator possession of:

11.1.1 WELLS. All wells, in good mechanical condition, completed in the Unitized Formation as defined in Section 1.3 of the Unit Agreement and *approved by Working Interest Owners.* For the purpose of adjusting the investment of the parties hereto, a *credit* [2] of Fifteen Thousand Dollars ($15,-000.00) will be allowed to the operator of each of said wells to reimburse him for intangible drilling and development costs incurred in completing said wells.

11.1.2 WELL AND LEASE EQUIPMENT. The tubing in each such well, together with the wellhead connections thereon, and all other lease and operating equipment used in the operation of such wells which *Work-*

*ing Interest .Owners determine is necessary or desirable* for conducting unit operations; and

11.1.3 RECORDS. A copy of all production and well records pertaining to such wells.

11.2 INVENTORY AND EVALUATION OF PERSONAL PROPERTY. Working Interest Owners shall at unit expense inventory and evaluate in accordance with the provisions of Exhibit 'D' the personal property so taken over.

11.3 INVESTMENT ADJUSTMENT. Upon approval by Working Interest Owners of such inventory and evaluation, each Working Interest Owner shall be credited with the value of its interest in all property so taken over by Unit Operator under Section 11.1.2, and charged with an amount equal to that obtained by multiplying the total value of all such personal property so taken over by Unit Operator under Section 11.1.2 by such Working Interest Owner's Unit Participation, as shown on Exhibit 'C'. If the charge against any Working Interest Owner is greater than the amount credited to such Working Interest Owner, the resulting net charge shall be paid and in all other respects be treated as any other item of unit expense chargeable against such Working Interest Owner. If the credit to any Working Interest Owner is greater than the amount charged against such Working Interest Owner, the resulting net credit shall be paid to such Working Interest Owner by Unit Operator out of funds received by it in settlement of the net charges described above." (Emphasis ours.)

2. In its brief Sohio says, "Section 11.1.1 of the Unit Operating Agreement * * * expressly provided for an intangible investment *adjustment* among the working interest owners of *$15,000 per well.*" (Emphasis ours.) We cannot agree. The $15,000 is referred to in Section 11.1.1 as a *credit,* not as an *adjustment.* In this suit Sohio claims that the in-

tangible investment *adjustment* shows a debit of $8,438.29—that is, money owed by PPI—notwithstanding a fixed credit of $15,000. Is is evident that the $15,000 credit is simply a factor in calculating the intangible investment adjustment whether the adjustment results in a debit or a credit.

There are other provisions which must be considered. Art. 3.1 of the Unit Operating Agreement provides that the Working Interest Owners shall exercise overall supervision and control of all matters pertaining to the development and operation of the Unit.

Art. 3.2.13 of the Operating Agreement is especially important. Without qualification it provides that among the matters to be passed on by the Working Interest Owners is "The adjustment and readjustment of investments." There is nothing in Art. 3.2.13 to suggest that the intangible investment may be considered alone, or that it shall constitute a complete investment adjustment without taking into consideration the tangible investment adjustment, or that it need not be approved by 80 per cent of the working interest.

Art. 4.3.2 provides that Working Interest Owners "shall act upon and determine all matters coming before them by the affirmative vote of Eighty per cent (80%) or more voting interest."

Appellee Sohio takes the position that Sec. 11.1.1 and Sec. 11.2 of Art. 11 of the Unit Operating Agreement may be considered separately and independently in arriving at the investment adjustment of each of the Working Interest Owners. Therefore, according to Sohio, the Unit Operator properly billed PPI for its share of the intangible adjustment as of January 1, 1962 without waiting for the inventory and evaluation as provided in Sections 11.2 and 11.3, or for the approval of the intangible investment adjustment by 80 per cent of the voting interest of the Working Interest Owners under Articles 3.2.13 and 4.3.2. We do not agree with Sohio.

The Unit Operating Agreement is to be construed as a whole in arriving at its true intent and meaning. As we view the matter, Art. 11, Sections 11.1.1, 11.1.2, 11.2 and 11.3 and Articles 3.2.13 and 4.3.2 must be considered together in determining whether in final analysis a Working Interest Owner is to be debited or credited on his adjustment of *total* investments, including both tangible and intangible. It might well be that an owner would properly be debited on his intangible adjustment, but following the inventory and evaluation prescribed in Section 11.2 and 11.3, he would properly be credited with an adjustment of his tangible investment in greater amount than the debit incurred by his intangible investment. The result would be that he would be entitled to a credit on his total investment instead of a debit. In any event, the adjustment of investments as we see it would have to be approved by 80 per cent of the voting interests as provided in Articles 3.1, 3.2.3 and in Art. 4.3.2 of the Unit Operating Agreement.

In the case now before us Sohio does not claim that there has ever been an inventory and evaluation of PPI's tangible investment, or that there has ever been any approval of any tangible or intangible investment adjustment by 80 per cent of the voting interests. Until this has been done it cannot be determined whether PPI's complete investment adjustment, including both its intangible and its tangible investments, will show as a debit (therefore a debt due by PPI to the Unit Operator), or a credit (therefore a debt due by the Unit Operator to PPI).

Our view seems to us to find some support in the minutes of a meeting of the "Operators Committee" held February 15, 1962. This could not have been a meeting of the Working Interest Owners as contemplated by Art. 4.3.2 of the Unit Operating Agreement, for less than 80 per cent of the Owners attended. However, the minutes do show the thinking of the committee members:

"A discussion of the actual cash *adjustment for inventory and intangible well cost followed.* Since it seemed advisable to allow the Operator to move equipment within the Unit, the group agreed to make a cash adjustment of the tangible inventory. Since there is to be some delay in getting a pilot area under flood,

the timing for the full scale development of the Unit is impossible to determine at this time. For this reason, the Operators present at the meeting mutually agreed that the intangible well adjustment should be carried on the Unit books as a posted credit or debit to each Working Interest Owner until some future date when a more firm waterflood development program can be adopted." (Emphasis ours.)

There is nothing in the record to show that the Working Interest Owners as of September 1, 1962 or as of February 15, 1962 had approved the wells which were to constitute the Unitized Formation as required by Sec. 11.1.1. That such final approval is an important factor in ascertaining the correct intangible adjustment, at least in the opinion of the committee members, even if we consider the intangible investment separately, is shown by another statement in the minutes of the committee meeting of February 15, 1962. We quote from the minutes:

"Mr. Hugh Robinson brought to the attention of the group that the failure of Tract No. 28 to qualify had altered the intangible adjustment of all the Operators a great deal. Mr. Harrison stated that an attempt is being made to qualify at least a portion of the tract."

It is our opinion that Sohio has failed completely in its undertaking to show that PPI incurred liability for its investment adjustment prior to September 1, 1963. We sustain PPI's point on appeal and its first crosspoint.

As we view this case Sohio finds itself confronted by the horns of a fatal dilemma. If it is correct in claiming that the liability of PPI was incurred January 1, 1962 then the cause of action against PPI was barred by the four year statute of limitations prior to 1967 when PPI refused to pay. On the other hand, if a consideration of the investment adjustment of both tangible and intangible investments is necessary to establish liability, and such com-

plete investment adjustment must then be approved by 80 per cent of the voting interest, then Sohio cannot recover.

The judgment of the trial court is reversed and judgment is rendered in favor of PPI that Sohio take nothing by its suit.

Reversed and rendered.